UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

720 LEX ACQUISITION LLC,                          :
                                                  :
                              Plaintiff,          :
                                                  :                    09-cv-7199 (AJN)
              -v-                                 :
                                                  :                    OPINION
GUESS? RETAIL, INC.,                              :
                                                  :
                              Defendant.          :
------------------------------------------------------------------X

ALISON J. NATHAN, District Judge:

      This diversity action arises from Defendant Guess? Retail, Inc.'s ("Guess's") breach of a

lease agreement (the "Guess Lease") with Plaintiff 720 Lex Acquisition LLC ("720 Lex").  On

October 21, 2011, Judge Batts granted summary judgment to 720 Lex on liability, and after the

case was transferred to the undersigned, the Court conducted a three-day bench trial from

October 7 to October 9, 2013 on damages.[1]

      Pursuant to the Court's procedures for nonjury trials, the parties submitted the direct

testimony of their witnesses by affidavit and their documentary evidence along with their joint

pretrial statement, except that the Court heard live testimony from one witness who was not

under the direct control of the party that called him.  Specifically, the Court received direct

examination declarations from 720 Lex's two expert witnesses, Robert Von Ancken and William

Picoli, as well as its lead attorney, Anthony L. Tersigni.  The Court also received direct

examination declarations from a Guess representative, Deborah Siegel, and from Guess's expert

witness, Jerome Haims.  In addition, Guess elicited live direct testimony from Alan Novich, a

---

[1] On January 15, 2013, this case was reassigned to the Honorable Marvin E. Aspen, who at the time was visiting
from the U.S. District Court for the Northern District of Illinois. Dkt. No. 58. Judge Aspen set a schedule and
received the parties' pre-trial materials, but the case was again reassigned to the undersigned before trial took place.

representative of non-party Steve Madden Retail, Inc. ("Madden").  Novich, Von Ancken,

Haims, and Siegel were cross-examined at trial.  The Court also received eleven exhibits from

720 Lex (Exhibits 1–8, 10, 12, and 13) and twenty-one from Guess (Exhibits A–H, L–M, and Q,

pages 1–3 of Exhibit R, Exhibits S–Z, and Exhibits DD–EE).

This opinion represents the Court's findings of fact and conclusions of law for purposes

of Federal Rule of Civil Procedure 52(a)(1).  The findings of fact appear principally in the

"Findings of Fact" section, but also appear in the remaining sections of the opinion.  For the

reasons set forth below, the Court concludes that 720 Lex is entitled to damages of $4,699,057.

I.      **Findings of Fact**

The parties' Joint Pre-Trial Statement ("JPTS"), proposed findings of fact and

conclusions of law, and other pretrial materials were submitted in February 2013.  Following

trial, the parties submitted amended proposed findings of fact and conclusions of law on October

23, 2013, as well as post-trial briefing on November 6, 2013.  Based on the evidence presented at

trial, the stipulated facts set forth in the JPTS, the Court's assessment of the witnesses'

credibility and demeanor, and the inferences reasonably to be drawn therefrom, the Court makes

the following findings of fact.

**A. The Parties and Jurisdiction**

Guess is a Delaware Corporation with its principal place of business in Los Angeles,

California.  JPTS at 3.  720 Lex is a New York limited liability company with its principal office

in New York, New York, and none of its members are citizens of Delaware or California.  JPTS

at 3; Notice of Removal ¶ 3.  Because the parties are citizens of different states and because the

amount in controversy in this action exceeds $75,000, this Court has subject-matter jurisdiction

under 28 U.S.C. § 1332(a)(1).

### B.  The Premises

The parties' dispute concerns a lease for a building (the "Premises") located at 720 Lexington Avenue, New York, New York, on the southwest corner of Lexington Avenue and East 58th Street.  PX 4 Ex. A.  The building runs twenty feet, five inches along Lexington Avenue and sixty-eight feet, nine inches along East 58th Street.  *Id.*

The building has four floors and a basement: the first floor (or "grade") occupies 1,409 square feet of space, the second floor occupies 1,230 square feet, the third and fourth floors each occupy 1,409 square feet, and the basement occupies 2,059 square feet.  PX 1 at 15.  The total above-grade space is therefore 5,457 square feet.  *Id.*  The grade and second floors of the building are used for retail selling space, while the third and fourth floors are used for retail storage.  *Id.*; Tr. at 49:17–21 (Novich).  A tenant leasing the Premises would not be expected to pay rent for the basement space separately, because "basement space is generally always included with the first floor rent."  Tr. at 183:4–5 (Von Ancken).

The Premises are located in a "destination retail corridor" comprising the blocks on Lexington Avenue between roughly East 57th Street and East 61st Street.  PX 1 at 13–14.  The affluence of the surrounding area and the high concentration of sought-after retailers, among other factors, make this corridor an extremely high-quality location for retail properties.  DX A at 39–42; PX 1 at 13–14.  In particular, properties near the Bloomingdale's department store, which is located on Lexington Avenue between 59th Street and 60th Street, benefit from traffic and visibility associated with that store.  DX A at 40; PX 1 at 13; Tr. at 118:23–119:1 (Von Ancken).

The Premises' corner location is also significant from a value perspective because of the increased visibility and aesthetic appeal of corner properties, particularly in the busy shopping

3

area near Bloomingdale's.  DX A at 65; PX 1 at 23, 24; Tr. at 48:20–21 (Novich); Tr. at 344:16–17, 345:4–6 (Siegel).

### C.  Summary of Approach

Before delving more deeply into the pertinent facts, the Court will provide a brief overview of how they bear on this opinion's legal analysis.  Guess and 720 Lex signed the Guess Lease on June 25, 2008, but Guess was not required to take possession until 720 Lex notified it that Madden, a shoe retailer that had previously leased the Premises pursuant to a 2007 lease agreement (the "Madden Lease"), had terminated its lease and vacated the Premises.  In 2009, 720 Lex finally reached a termination agreement with Madden, but Guess thereafter failed to take possession of the Premises, thereby breaching the Guess Lease.

The Guess Lease contains a liquidated damages clause that requires determining the reasonable rental vale of the Premises on the date of Guess's breach.  To assess the Premises' value at that time, the Court (using the same general framework as both parties' experts) must look to leases on comparable properties around the same time, which serve as indicators of how much tenants were willing to pay to rent similar space.  The Madden Lease is an important comparable, and after originally signing the Madden Lease in 2007, Madden made a number of improvements to the Premises that bear on its reasonable rental value as of Guess's breach.  For these reasons, the Court begins with a detailed discussion of Madden's tenancy before proceeding to describe the Guess Lease and the events giving rise to this lawsuit.

### D.  The Madden Lease and Its Amendments

The Premises are currently occupied by Madden, a shoe retailer.  Madden leased the Premises from 720 Lex pursuant to the Madden Lease, which was a ten-year lease agreement dated January 3, 2007.  JPTS at 5; PX 5.  Under the original terms of the Madden Lease, Madden

leased only the first floor, second floor, and basement of the Premises.  PX 5 § 1.1; DX A at 57.

The rent under the original Madden Lease was $850,000 annually for years one through three,

$926,500 annually for years four through six, $1,009,885 annually for years seven through nine,

and $1,040,181 for year ten.  JPTS at 5.

The Madden Lease also required Madden to pay to 720 Lex certain amounts for property

taxes.  Specifically, Madden was required to pay 100% of any property tax increases over the

amount paid in the "base year" spanning July 1, 2007 to June 30, 2008.  JPTS at 5; PX 5 §§ 3.1–

3.11; DX A at 57.  Although Madden was therefore effectively required to pay certain taxes

itself, 720 Lex remained responsible for paying a fixed amount of taxes annually—i.e., the

amount paid in the 2007–2008 base year, or $125,928.60.  DX A at 70; PX 1 at 30.

The Madden Lease has been substantially amended twice.  Under the first amendment,

dated February 1, 2007, Madden leased the third and fourth floors of the Premises, and agreed to

pay additional rent of $420,000 annually for years one through five and $441,000 annually

thereafter.  JPTS at 5–6; DX E §§ 2, 5.  Madden also received the right to install a "glass curtain

wall" on the third and fourth floors, as well as the "sole right to place exterior signage on the

Building and the right to license such right to a third-party, provided, however, all exterior

signage must comply with all laws and ordinances and all rules, orders or regulations of any

governmental authority."  DX E §§ 3, 12.  Under the second lease amendment, signed in August

2007, Madden leased ground-floor space that had formerly been occupied by a newsstand.  DX F

§ 3.  In return, Madden agreed to pay an additional $48,000 annually for years one through three,

$52,320 annually for years four through six, $57,028.80 annually for years seven through nine,

and $58,739.66 for year ten.  JPTS at 6.

In addition to the February and August 2007 amendments, the Madden Lease has been modified by a Lease Termination Agreement signed on May 11, 2009. DX H. Under this termination agreement, 720 Lex was permitted to terminate the Madden Lease upon paying $500,000 to Madden, in order to allow Guess to occupy the Premises. JPTS at 6. At the time that the termination agreement was signed, 720 Lex had already entered into the Guess Lease with Guess, which was signed on June 25, 2008. PX 4.

### E. The Madden Remodel and Sign

Madden completed an "extensive" remodel of the inside and outside of the Premises in 2007 and 2008. Tr. at 33:19–22 (Novich); Haims Aff., PX DD, ¶ 34; *see* PX S at 1–3, PX U (before and after pictures). As part of the remodel, the Premises' brick façade was replaced with a steel and glass façade. Haims Aff., PX DD, ¶ 34. The remodel cost between $2 million and $3 million. Tr. at 43:15–44:3 (Novich); Haims Aff., PX DD, ¶ 34. In connection with the project, Madden submitted a permit application to the New York City Department of Buildings, which was approved on September 26, 2007. Tr. at 35:7–36:6, 61:11–12 (Novich); PX W.

Madden painted a large sign on the exterior wall of the third and fourth floors of the Premises. PX U; Tr. at 30:22–31:3 (Novich). The highly visible sign, which, at the time of trial, had been in place for six or seven years, Tr. at 31:4–5 (Novich), read "Steve Madden" in black capital letters against a gray background, and wrapped around the entire building: the first three letters were located on the Lexington Avenue side of the building, and the remaining letters ran the full length of the East 58th Street wall. PX U. The sign was painted on the side of the building, not affixed to it. PX U; Tr. at 64:11 (Novich); Tr. at 309:12–13 (Haims). Neither the City of New York nor 720 Lex, as Madden's landlord, ever asked Madden to take down the sign. Tr. at 31:3–14, 50:7–13 (Novich). Guess asserts that architectural drawings depicting the large

6

Steve Madden sign, DX X, were submitted to the Department of Buildings as part of Guess's permit application, but there is no admissible evidence in the record indicating that those drawings were, in fact, submitted with the application. *See, e.g.*, Tr. at 34:7–9 (indicating that Novich was not aware whether the drawings in Defense Exhibit X were submitted); Tr. at 146:13–23, 148:2–9, 150:14–24 (same for Von Ancken); DX D at 2 (indicating that Haims looked at both the architectural plans and the permit application without suggesting that the former were part of the latter). Although the Court therefore cannot find that the architectural plans were, in fact, submitted to the City, this uncertainty is immaterial to any conclusions reached later in this opinion.

The Court finds that Madden was attracted to the Premises, and decided to lease the third and fourth floors, in significant part because of the marketing opportunity presented by the ability to have a large sign on the building. Novich, Madden's representative, credibly testified that the sign was "a big part of the reason" that Madden paid over $400,000 annually to lease the third and fourth floors of the Premises under the first lease amendment. Tr. at 49:11–15. According to Novich's credible testimony, Madden's CEO Jamieson Karson, who negotiated and signed the first lease amendment, "wanted to use the outside of the building as a marketing tool especially considering that when you come out of Bloomingdale's if you look left, you know, you had at least a decent shot of seeing something that said Steve Madden." Tr. at 45:8–12. Madden also needed "space for shoes," and it used the third and fourth floors for storage as well as signage. Tr. at 49:14–15.

### F. The Guess Lease and Guess's Breach

The Guess Lease is a contract dated June 25, 2008. PX 4 at 1. In the lease, 720 Lex is named as the "Landlord" and Guess is named as the "Tenant." *Id.* Under the terms of the Guess

Lease, Guess agreed to lease the entire Premises, except for the roof, for a term of fifteen years.

*Id.* §§ 1.1, 1.2, Ex. A.  Guess also agreed to pay the following amounts of "Fixed Rent":

| Year | Start Date | End Date | Fixed Rent |
|------|-----------|----------|-----------|
| 1 | 2/1/2010[2] | 7/31/2010 | $750,000.00 |
| 2 | 8/1/2010 | 7/31/2011 | $1,500,000.00 |
| 3 | 8/1/2011 | 7/31/2012 | $1,545,000.00 |
| 4 | 8/1/2012 | 7/31/2013 | $1,591,350.00 |
| 5 | 8/1/2013 | 7/31/2014 | $1,639,090.50 |
| 6 | 8/1/2014 | 7/31/2015 | $1,688,263.22 |
| 7 | 8/1/2015 | 7/31/2016 | $1,738,911.11 |
| 8 | 8/1/2016 | 7/31/2017 | $1,791,078.44 |
| 9 | 8/1/2017 | 7/31/2018 | $1,844,810.80 |
| 10 | 8/1/2018 | 7/31/2019 | $1,900,155.12 |
| 11 | 8/1/2019 | 7/31/2020 | $1,957,159.78 |
| 12 | 8/1/2020 | 7/31/2021 | $2,015,874.57 |
| 13 | 8/1/2021 | 7/31/2022 | $2,076,350.81 |
| 14 | 8/1/2022 | 7/31/2023 | $2,138,641.33 |
| 15 | 8/1/2023 | 7/31/2024 | $2,202,800.57 |

*Id.* § 2.1; PX 1 at 8; DX A at 55.  In addition to Fixed Rent, Guess agreed to pay "Additional Rent" consisting of certain real estate taxes.  PX 4 §§ 3.1–3.11.  Unlike the Madden Lease, under which Madden paid only part of the annual real estate taxes, the Guess Lease provided that Guess was fully responsible for all such taxes.  DX A at 62.

Similar to the Madden Lease (as modified by its amendments), the Guess Lease provided that Guess was "permitted to have the maximum exterior signage permitted by local governance,

---

[2] Guess agreed to begin paying rent on the "Rent Commencement Date," which was defined as either 90 days after 720 Lex delivered possession of the Premises to Guess or 90 days after Guess received permits to perform certain construction work.  PX 4 § 1.5.  Both parties' experts assumed that the permit process would take six months, and therefore assumed that Guess would start paying rent on February 1, 2010.  PX 1 at 8; DX A at 55.

codes or ordinances." PX 4 § 25.A. And the Court finds that Guess, like Madden, was attracted

to the Premises in part because of the marketing opportunity associated with these signage rights.

Siegel credibly testified that Guess was attracted to the Premises because of "the amazing

presence of a sign that basically covered the side of the front of a building in such a small corner

area." Tr. at 353:11–13. She also stated that although Guess did not ascribe a specific value to

the signage in negotiating the lease, the signage rights were a "significant enhancement that

factored into the overall rent that was appropriate for the subject property." Siegel Aff., DX EE,

¶ 14. At trial, Plaintiff's counsel sought to undermine Siegel's testimony about the signage's

value by stressing that it appeared in a supplemental affidavit prepared in concert with defense

counsel. Tr. at 338–43 (Siegel). But the fact that Guess saw the signage as an important element

of the Premises' rental value is consistent with common sense, Novich's testimony concerning

how Madden viewed the signage, and Siegel's credible testimony at trial that the signage was

"key" to the Guess Lease "from day one." Tr. at 344:23–25.

      The Guess Lease contained a provision stating that the only broker associated with the

lease was Urban Retail Real Estate Group, LLC ("Urban"), and that Urban's broker fee "shall be

the responsibility of [720 Lex] pursuant to a separate agreement." PX 4 § 21.7. Consistent with

this provision, 720 Lex and Urban were parties to an April 4, 2008 Commission Agreement. DX

M. Under that contract, 720 Lex agreed to pay Urban a total of $675,000 in three installments:

one third upon Guess's possession of the Premises, one third upon rent commencement, and one

third 90 days after rent commencement. *Id.* at 1. This Commission Agreement was later

renegotiated on July 1, 2009; the only change was that the total commission due from 720 Lex to

Urban was reduced to $400,000. PX 7.

9

As noted, 720 Lex had negotiated with Madden to allow it to terminate the Madden Lease so that Guess could occupy the Premises. Accordingly, the Guess Lease did not contain a set "Commencement Date," but rather provided that the Commencement Date would be the date on which 720 Lex "deliver[ed] possession of the Premises" to Guess. PX 4 § 1.4. In the Guess Lease, Guess acknowledged that the Premises were leased by Madden, and that delivery of possession was contingent on 720 Lex's agreeing with Madden to terminate the Madden Lease. *Id.* § 1.6(b). 720 Lex agreed to give Guess 45 days' written notice before it delivered possession of the Premises. *Id.* § 1.4. If 720 Lex failed to deliver possession to Guess by August 1, 2009, then Guess was permitted to terminate the lease. *Id.* § 1.6(a).

On May 15, 2009, 720 Lex notified Guess that it would deliver possession of the Premises by June 29, 2009. Memo. & Order, Dkt. No. 30, at 5. But Guess never actually took possession because, it claimed, the Guess Lease had already been terminated orally. *Id.* at 5–6. In her October 20, 2013 summary judgment opinion on liability, Judge Batts held that Guess's failure to take possession of the Premises was a breach of the Guess Lease, concluding that the lease could not be terminated orally and rejecting Guess's illegality and fraud-in-the-inducement defenses. *Id.* at 7–15.

### G. Damages Under the Guess Lease

The Guess Lease provides for two alternative means of calculating damages in the event of a breach. First, section 19.2 of the lease provides (generally speaking) that Guess could continue paying the rent that became due on each due date, minus amounts that 720 Lex received in rent from any tenant(s) that leased the Premises following Guess's breach. PX 4 § 19.2. In other words, Guess would make a series of payments over time as compensation for its breach.

Second, section 19.3 (titled "Rent Acceleration") provides, as relevant here:

> As an alternative to the remedy set forth in Section 19.2, Landlord may recover from Tenant as liquidated damages in addition to any unpaid Rent and Additional Rent accrued to the date of such termination, an amount equal to the difference, for the unexpired portion of the term hereof, between: (1) the aggregate of all Rent reserved hereunder including Fixed Rent and Additional Rent; and (2) the then fair and reasonable rental value of the Premises, the rent under clause (1) above being discounted at the rate of four (4%) percent per annum to its present worth. . . . In determining the reasonable value of the Premises, the rent realized by re-letting, if such re-letting be accomplished within a reasonable time after such dispossession or termination, shall be deemed prima facie to be the reasonable rental value.

PX 4 § 19.3; JPTS at 4. Thus, unlike section 19.2, section 19.3 calls for a single damages payment by Guess. Whether to pursue damages under section 19.2 or instead under section 19.3 is 720 Lex's choice; 720 Lex has elected the latter option. JPTS at 3. The parties' dispute therefore centers on the interpretation and application of section 19.3.

The parties agree that there is no "unpaid Rent" or "Additional Rent" accrued, and therefore focus on clauses (1) and (2), quoted above. The calculation of clause (1)—"all Rent reserved hereunder"—is largely undisputed: The Guess Lease contains a payment schedule setting forth the rent to be paid annually, and section 19.3 specifies the discount rate (4% per annum) to be applied to those payments. PX 4 §§ 2.1; 19.3. The parties' experts calculated different amounts for the value of clause (1) because Haims subtracted a lease termination fee and leasing commission from the rent reserved in year one. DX A at 73, 79, 92–99. Without those adjustments, which 720 Lex disputes, the discounted value of clause (1) is $18,968,816. PX 1 at 17–18; *cf.* DX A at 73, 79, 92–94.[3] The value of clause (2)—the "then fair and

---

[3] For the entire fifteen-year term of the Guess Lease, Haims arrived at a value for clause (1) of $17,839,007. DX A at 92–94. The difference between that figure and Von Ancken and Picoli's $18,968,816 is attributable to the fact that Haims both subtracted a termination fee and leasing commission from the first year's rent, as noted in the text, and discounted the resulting value of the first year's rent. *Id.* Adding back the discounted value of the two adjustments yields $18,968,816, consistent with Von Ancken and Picoli's number.

reasonable value of the Premises"—is disputed and is the primary subject of the expert evidence

in this case, as discussed in more detail below.

### H.  720 Lex's Expert Reports

720 Lex submitted reports prepared by its two experts, Von Ancken and Picoli, as well as

these experts' declarations of direct testimony.  Von Ancken is a certified real estate appraiser

and the Chairman of Landauer Valuation & Advisory; he was previously Executive Director of

Grubb & Ellis, a commercial real estate firm.  Von Ancken Aff., PX 9, ¶ 2.  Von Ancken

performed his valuation with Picoli's assistance, but only Von Ancken testified at trial, and as a

result only his written direct testimony was received in evidence.  The Court finds that Von

Ancken is qualified to assist the Court in determining liquidated damages by virtue of his

education, which includes graduate work and courses in real estate valuation; his extensive work

as a real estate appraiser; and his role as an expert witness on over 500 previous occasions.  *Id.*,

Professional Profile at 1–7; *see* Fed. R. Evid. 702 ("A witness who is qualified as an expert by

knowledge, skill, experience, training, or education may testify in the form of an opinion or

otherwise . . . .").

720 Lex submitted three documents prepared by Von Ancken and Picoli.  The first is a

report setting forth their calculation of liquidated damages.  PX 1.  In that report, 720 Lex's

experts took two basic approaches to calculating liquidated damages, both of which used a

valuation date of August 1, 2009—"the date for delivering possession of the premises to Guess

under Section 1.6 of the Guess Lease."  Von Ancken Aff., PX 9, ¶ 6.  The first approach

calculated liquidated damages as the difference between (1) the rent reserved under the Guess

Lease and (2) the projected rental income under a hypothetical "market lease."  To project the

value of the Premises under this market lease, Von Ancken and Picoli looked to seven rental

comparables—leases on similar properties located near the Premises—and applied certain adjustments based on factors "such as market conditions, location, [and] frontage" in order to arrive at an overall "market rent for the subject premises." *Id.* ¶ 8; *see* PX 1 at 19–29. Under this approach, 720 Lex's experts arrived at a market value of $140 per square foot for the Premises as of August 1, 2009, with projected increases of 2.5% per year thereafter. Von Ancken Aff., PX 9, ¶ 11; PX 1 at 25. This first approach also assumed that in the first year of the market lease, two deductions from net rental income would be made: four months' worth of "free rent" and a leasing commission of 48% of the first year's rent. PX 1 at 25.

The second approach calculated liquidated damages as the difference between (1) the rent reserved under the Guess Lease and (2) the rent reserved under the Madden Lease for the remaining term of that lease (eight years), plus "projected rents under a market lease for the ensuing period." Von Ancken Aff., PX 9, ¶ 15; *see* PX 1 at 30–33. In the first year of the "market" lease under this approach (i.e., year nine), Von Ancken and Picoli again assumed that four months' free rent and a 48% leasing commission would be deducted from net rental income. PX 1 at 30.

In their initial report, 720 Lex's experts mistakenly failed to consider the amendments to the Madden Lease, and therefore understated the amount of rental income generated by that lease. After learning of this error, they submitted a supplemental report that accounted for the rent due under the lease amendments. PX 2. This supplemental report altered the experts' conclusions under their second (Madden/market) valuation approach, but it did not affect their view of the market value of the premises under their first (market-only) approach. *Id.*; Tr. at 69:2–82:11, 183:23–184:5 (Von Ancken).

To arrive at a present value for the future cash flows they projected, Von Ancken and Picoli used a 4% discount rate for the rent reserved under the Guess Lease, as prescribed by section 19.3 of that lease, and two different potential discount rates for the market rents or the Madden/market rents. The first was a "market" discount rate of 7.5%, which was based on a variety of factors, "the most significant being the internal rate of return sought by institutional and other major investors for leased retail premises." Von Ancken Aff., PX 9, ¶ 10. The second was a 4% discount rate, which Von Ancken and Picoli chose in light of the possibility that the Guess Lease might be interpreted, as a legal matter, as requiring that rate. *Id.* ¶ 9. Thus, 720 Lex's experts provided four liquidated damages calculations: one in which market rents were discounted by 7.5%, one in which market rents were discounted by 4%, one in which Madden/market rents were discounted by 7.5%, and one in which Madden/market rents were discounted by 4%. A summary of these four alternative calculations is set forth below:

| Scenario | Approach | Discount Rate | Liquidated Damages |
|----------|----------|---------------|--------------------|
| 1 | Market only | 4.0% | $9,593,219 |
| 2 | Market only | 7.5% | $11,746,226 |
| 3 | Madden/market | 4.0% | $6,261,181 |
| 4 | Madden/market | 7.5% | $8,731,186 |

*See* Von Ancken Aff., PX 9, ¶¶ 13, 16; PX 1 at 1–2; PX 2 at 2–3.

In addition to the initial expert report and the supplemental report, 720 Lex submitted a rebuttal report prepared by Von Ancken and Picoli that highlights disagreements with the methodology, assumptions, and conclusions employed by Haims. PX 3.

### I.  Guess's Expert Reports

Guess submitted certain reports prepared by its expert, Haims, as well as Haims's direct testimony in affidavit form.  (Guess submitted two affidavits signed by Haims, but the Court received only the later one, dated May 15, 2013, into evidence as Defendant's Exhibit DD.  Tr. at 199:6–200:10.)  Haims is a certified real estate appraiser with over 40 years of appraisal experience.  Haims Aff., DX DD ¶¶ 1, 12.  The Court finds that Haims, by virtue of his academic and professional background, *see id.* ¶¶ 6–13, is qualified to offer expert testimony regarding the liquidated damages issues presented in this case.

The basic framework for Haims's analysis was similar to Von Ancken and Picoli's.  Like 720 Lex's experts, Haims used two approaches to calculating liquidated damages, one that compared the rent reserved under the Guess Lease to an estimate of the market rental value of the Premises, and a second that compared the rent reserved under the Guess Lease to the rent generated under the remaining portion of the Madden Lease and projected market rents after the expiration of the Madden Lease.  Haims Aff., DX DD, ¶ 71; *see* DX A at 74, 80.  To arrive at a "market" rental value for the Premises, Haims's first approach also looked to existing leases on comparable properties and made appropriate adjustments involving lease type, market conditions, location, size, frontage, and signage.  DX A at 59.  Haims also used a "retrospective valuation date" of August 1, 2009.  Haims Aff., DX DD, ¶ 37.  And like Von Ancken and Picoli, Haims's market-only scenario assumed that four months' free rent and a 48% leasing commission should be deducted from net rental income in the first year of the market lease.  DX 1 at 76.[4]

---

[4] In his Madden/market scenarios, Haims proposed a lower leasing commission on the assumption that "the landlord has its own brokerage firm and, therefore, was only responsible for paying half of the typical retail leasing commissions due to the tenant's broker."  DX 1 at 71.

Despite these basic methodological similarities, Haims's analysis departs from 720 Lex's experts' in several respects. First, Haims's comparables analysis generated a significantly higher market rental value of the Premises as of August 1, 2009: $240 per square foot. DX A at 67. Haims assumed that market rents would be stable from year one to year two, grow by 2% from year two to year three, and then grow at an annual rate of 3% for the remaining lease term. *Id.* at 71. Haims also arrived at a market discount rate of 5%, based on his conclusion that the Premises' desirable location and characteristics would attract a high-quality tenant, and that an investor therefore would require a "yield similar to the yield associated with . . . Aaa Corporate Bonds." *Id.* at 77–78. Haims made two deductions from the year-one rent reserved under the Guess Lease, on the assumption that Guess's failure to occupy the Premises meant that 720 Lex no longer had to terminate the Madden Lease (at a cost of $500,000) or pay Urban its commission (at a cost of $675,000). DX A at 69. Haims did not review the July 1, 2009 agreement between 720 Lex and Urban under which Urban's commission was reduced to $400,000. *See* Haims Aff., DX DD, ¶ 23 (stating only that Haims "reviewed an April 4, 2008 commission agreement").

Haims generated ten liquidated damages calculations, each of which incorporated a different set of assumptions that might depend on the Court's ultimate legal conclusions. Specifically, he provided a set of calculations that assumed only a ten-year term in light of Guess's legal argument that projecting damages beyond ten years is overly speculative. Tr. at 221:6–10; Haims Aff., DX DD, ¶¶ 72–76. He also utilized three alternative discount rates: his chosen market rate of 5%, the 4% rate specified in section 19.3, and a 0% rate that he surmised might be appropriate given section 19.3's silence on the rate to be applied to clause (2). DX A at 76–77. A summary of Haims's ten alternative calculations is set forth below:

| Scenario | Approach | Term | Discount Rate | Liquidated Damages |
|----------|----------|------|---------------|--------------------|
| 1 | Madden/market | 10 years | 4.0% | $1,140,000 |
| 2 | Market only | 10 years | 4.0% | $970,000 |
| 3 | Madden/market | 10 years | 0.0% | $0 |
| 4 | Madden/market | 10 years | 5.0% | $1,650,000 |
| 5 | Market only | 10 years | 5.0% | $1,540,000 |
| 6 | Madden/market | 15 years | 4.0% | $1,990,000 |
| 7 | Market only | 15 years | 4.0% | $1,810,000 |
| 8 | Madden/market | 15 years | 5.0% | $3,120,000 |
| 9 | Market only | 15 years | 5.0% | $3,020,000 |
| 10 | Madden/market | 15 years | 0.0% | $0 |

*See* Haims Aff., DX DD, ¶¶ 71–81; DX A at 73, 79, 91–99.  Notably, unlike Von Ancken and

Picoli, Haims's "market-only" scenarios generate lower liquidated damages than do his

"Madden/market" scenarios, all else equal.

In addition to the report setting forth Haims's own analysis, Guess also submitted three

separate rebuttal reports in which Haims objected to various aspects of Von Ancken and Picoli's

work.  DX B–D.

## II.   Conclusions of Law

In light of the foregoing findings of fact, the Court reaches the following conclusions of

law.  As noted, the Court's sole task is to determine the amount of liquidated damages to which

720 Lex is entitled under section 19.3 of the Guess Lease.  Unlike many liquidated damages

clauses, which specify a dollar amount or prescribe a straightforward calculation, section 19.3

requires a determination of the "then fair and reasonable rental value of the Premises."  At the

same time, because the parties have specified via contract what 720 Lex's damages should be,

17

the law governing contract damages in the absence of a liquidated damages clause does not provide a framework for analysis. The Court's task may be somewhat more complex than it would be under a more straightforward liquidated damages clause, but the essential nature of the task—giving effect to the contract—is the same. In this case, that task simply requires determining, as a factual matter, what the reasonable rental value of the Premises was at the time of Guess's breach. *Cf. Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 352–53 (S.D.N.Y. 2003) (Lynch, J.) (describing liquidated damages clause in an aircraft lease that included "Fair Market Rental Value" as a component).

### A. Guess's *Daubert* Motion Is Denied

Guess's broadest attack on 720 Lex's experts is its argument that the Court should exclude their opinions and testimony entirely under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Guess previously moved to exclude this same evidence before trial, and the Court denied that motion without prejudice to renewal at trial.[5] Dkt. No. 56. In its post-trial submissions, Guess again argues that "Mr. Von Ancken's opinions and written testimony are unreliable and must be excluded." Guess Post-Trial FFCL at 2 (citation omitted). The Court disagrees.

As the Court noted in its earlier order denying Guess's pre-trial motion, *Daubert* and its progeny, which require a district court to exclude expert testimony unless it "rests on a reliable foundation and is relevant to the task at hand," 509 U.S. at 597; *see also* Fed. R. Evid. 401, 702, do not apply straightforwardly in the context of bench trials. In a jury trial, the district judge must serve a gate-keeping function primarily to prevent the jury from being "bamboozled by

---

[5] On February 28, 2013, Judge Aspen denied another motion by Guess to strike 720 Lex's expert reports and testimony under *Daubert* and *Kumho Tire*, finding that the motion was "identical to the motion in limine" that had previously been denied without prejudice. Dkt. No. 79 at 1.

18

technical evidence of dubious merit." *New York v. Solvent Chem. Co.*, No. 83-cv-1401C, 2006 WL 2640647, at *1 (W.D.N.Y. Sept. 14, 2006) (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1042 (N.D. Ill. 2003)) (internal quotation mark omitted).   But when there is no jury, arguments like Guess's "are essentially asking [the Court] to gate-keep expert testimony from [itself]." *Joseph S. v. Hogan*, No. 06-cv-1042 (BMC) (SMG), 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011).   Under these circumstances, unless the disputed evidence is wholly irrelevant or so speculative as to have no probative value, it is appropriate for the Court to "take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology." *Id.* at *3; *accord In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006).   These considerations weigh even more strongly against exclusion post-trial, because the Court has the benefit of cross-examination and a full record to help assess the reliability of the various pieces of expert evidence that 720 Lex has introduced.

Moreover, even assuming that wholesale exclusion of unreliable expert reports and testimony might sometimes be appropriate in this context, the Court would not exclude the evidence that Guess seeks to exclude in this case.   In assessing the reliability of expert evidence, courts look to indicia including, but not limited to, whether the evidence (1) is based on "sufficient facts or data," (2) "is the product of reliable principles and methods," and (3) results from the reliable application of the principles to the facts. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting Fed. R. Evid. 702) (internal quotation marks omitted).   The "principles and methods" that 720 Lex's experts used are the same as the ones used by Guess's expert.   Both projected rental income for the Premises by adjusting comparable leases and then discounted that income at what they believed to be appropriate rates.   Both received guidance from counsel on certain elements of their analysis that arguably depended on

19

legal questions beyond their expertise as appraisers, but generated enough scenarios to cover a range of legal conclusions.  Moreover, the appropriateness of the data relied upon by 720 Lex's experts, as well as the application of their methodology to that data, depends significantly on the resolution of the very legal questions and factual issues presented at trial.  *See, e.g.*, Guess Post-Trial FFCL at 21 (asserting that Von Ancken "failed to correctly analyze income from the Steve Madden newsstand and sign").  There is no facially implausible "apples and oranges" analysis that might justify exclusion.  *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984).  In short, Guess's arguments go to the weight of the relevant testimony, and not its admissibility.  *Cf. Marcus v. Quattrocchi*, No. 08-cv-9514 (VB), 2014 WL 521340, at *16–17 (S.D.N.Y. Feb. 4, 2014) (holding that questions about inputs into expert's real estate valuation were "a subject for cross-examination").

### B.  Damages Based on the Full Lease Term Are Not Overly Speculative

Several of Haims's calculations project liquidated damages over a ten-year period, notwithstanding the fact that the Guess Lease has a fifteen-year term.  DX A at 95–99.  In these calculations, the effect of the shorter term is to lower the amount of liquidated damages.  In its pre-trial memorandum of law, Guess argued that a ten-year projection was appropriate because damages projections over the last five years of the Guess Lease (i.e., for 2019 to 2024) would be overly speculative.  Guess Pre-Trial Br. at 5–9.  Guess appears to have abandoned this argument, as the damages amounts it proposes in its post-trial submissions all involve fifteen-year projections.  Guess Post-Trial FFCL at 24–25.

In any event, even if Guess had not abandoned this argument, the Court would reject the proposition that a liquidated damages calculation based on the full fifteen-year lease term is too speculative.  Section 19.3 of the Guess Lease clearly contemplates a fifteen-year projection

because it defines clause (1) as "the aggregate of *all Rent* reserved hereunder," PX 4 § 19.3 (emphasis added), and the lease has a fifteen-year term.  As a result, Guess's argument would require disregarding the parties' unambiguous intentions.

That might be justifiable if Guess were correct on the law, but the cases that it cites do not stand for the broad rule that projections beyond ten years are inevitably too speculative. Instead, they simply indicate that whether damages are overly speculative depends on the nature of the evidence presented in each case.  *See Palmer v. Conn. Ry. & Lighting Co.*, 311 U.S. 544, 557 (1941) ("The number of years to be considered depends upon the fullness and quality of the evidence offered to establish the damages."); *Conn. Ry. & Lighting Co. v. Palmer*, 305 U.S. 493, 505 (1939) ("The determination of the amount to be allowed as the damage will be based on evidence which satisfies the mind."); *Hawkinson v. Johnston*, 122 F.2d 724, 731 (8th Cir. 1941) ("[T]he period for which the damages can be reasonably forecast or soundly predicted . . . must depend on the circumstances and evidence of the particular case.").  These cases, though not decided under New York law,[6] are consistent with the general rule—recognized in New York— that contract damages "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach of the contract."  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886)) (emphasis and internal quotation marks omitted).  In this context, the one New York case that Guess cites should be understood as reflecting the speculative nature of the evidence presented there, rather than stating a general rule.  *See Admae Enters., Ltd. v. 1000 N. Blvd. Corp.*, 104 A.D.2d 919, 920

---

[6] The Supreme Court cases cited by Guess concerned a provision of the Bankruptcy Act that limited a landlord's claim on its tenant's bankruptcy estate to "the extent of the actual damage or injury determined in accordance with principles obtaining in equity proceedings."  *Palmer*, 311 U.S. at 552 (quoting the provision then codified at 11 U.S.C. § 205(b)).  *Hawkinson* applied Missouri law.  *See* 122 F.2d at 726.

(2d Dep't 1984) (holding that "damages which might be incurred during the last 20 years of the [30-year] lease are too speculative to serve as the basis of a damage award").

In this case, the evidence presented suggests that projecting damages beyond ten years is hardly an impossible task for experienced appraisers.  Haims conceded that he prepared ten-year scenarios only because defense counsel instructed him to, and he indicated that there otherwise would have been no reason for him to do so as a matter of appraisal methodology.  Tr. at 221:6–8, 222:2–223:13.  Nothing in the reports submitted by the parties' experts suggests that they felt significantly less confident in their 2019–2024 projections than in their 2009–2018 projections.  Therefore, Guess finds no support for its assertion that rental value projections suddenly become overly speculative as a matter of law starting at year ten, and the Court will look to the full term of the Guess Lease in calculating damages, consistent with the language of section 19.3.

### C.  The Madden Lease Is Not a Post-Breach Re-Let

As noted, section 19.3 of the Guess Lease provides that in determining "the reasonable value of the Premises, the rent realized by re-letting, if such re-letting be accomplished within a reasonable time after such dispossession or termination, shall be deemed prima facie to be the reasonable rental value."  PX 4 § 19.3.  Guess argues that the Madden Lease, which was signed before Guess breached the Guess Lease but which continued in effect following that breach, qualifies as a "re-letting" and therefore renders the Madden rents "prima facie . . . the reasonable rental value."  *E.g.*, Guess Post-Trial FFCL at 18–19.  The Court disagrees.

The lease's plain language forecloses Guess's interpretation.  Guess itself cites a dictionary that defines "relet" as "to let again" or "to renew the lease of."  *Id.* at 18.  But neither of these definitions describes the continuation of the Madden Lease.  Following Guess's breach, 720 Lex did not let the Premises to Madden *again*, nor did it *renew* Madden's lease; it simply

declined to terminate an already-existing lease.  Additionally, the Guess Lease assumes that re-letting will be "accomplished . . . after" a breach, implying that a lease signed before the breach does not qualify.

Consistent with the plain meaning of the lease's language, the evident purpose of looking to a post-breach re-let is that a new lease signed within a "reasonable time" of a breach likely will be a good indicator of market conditions at the time of that breach.  By contrast, a previously signed lease—like the Madden Lease, which was signed two years before Guess's breach—may not bear the same relationship to prevailing market values.  For these reasons, the Court rejects Guess's theory that the reasonable rental value of the Premises should be determined solely by looking to the Madden rents for the remaining term of the Madden Lease.

This conclusion has two consequences.  The first is that the Court must arrive at the reasonable rental value of the Premises in another way.  Both parties' experts set forth analyses based on leases signed by tenants in comparable properties.  DX A at 59; PX 1 at 19–29.  The experts then adjusted these comparable leases in various respects based on how the properties compared to the Premises in terms of characteristics, location, lease type, lease date, and other variables.  In this way, the parties were able to estimate the reasonable rental value of the Premises by, in effect, estimating what a hypothetical new tenant would have paid to lease the Premises in August 2009, following Guess's breach.  As explained later in this opinion, both parties' "comparables" analyses are flawed in various respects, but the Court agrees with the basic premise that the reasonable rental value of the Premises can and should be approximated by looking to the value of comparable leases and making appropriate adjustments.  *See also, e.g.,* *Varney v. Ditmars*, 217 N.Y. 223, 228 (1916) (stating that "fair and reasonable value" is synonymous with "market value"); Von Ancken Aff., PX 9, ¶ 9 ("For a real estate appraiser, 'fair

and reasonable value' has a definite, precise, and commonly understood meaning, *i.e.*, market value."). Accordingly, because the Court has rejected Guess's argument that the reasonable rental value of the Premises should be determined by looking to the Madden rents alone, the following analysis will focus on (1) determining the most appropriate comparable leases to use and (2) what adjustments ought to be made to those leases.

The second consequence of the Court's conclusion that determining the reasonable rental value of the Premises requires looking beyond the Madden rents involves the fact that signing a new lease requires a landlord to make two kinds of expenditures that result in less rental income in the first year of the lease: leasing commissions and "free rent." The parties' experts agree that, in projecting the cash flows generated by a market lease in order to determine the reasonable rental value of the Premises, it is appropriate to deduct leasing commissions and four months' free rent in the first year of that market lease. DX A at 76; PX 1 at 25. As already discussed, the Madden Lease is not a post-breach re-let, so the Court must look to projected *market* rents to determine reasonable rental value. This requires deducting leasing commissions and free rent—which, the parties' experts agree, would be deducted from a hypothetical market lease—from the year-one rental income generated by the Premises.[7]

In a rare instance of agreement, the parties' experts actually propose the same leasing commission and free rent deductions, at least as a percentage of the first year's rental income:

---

[7] Notably, Guess's assumption that such deductions would not be required if the Madden Lease were to qualify as a post-breach re-let is not necessarily correct. *E.g.*, DX A at 61. Even if a post-breach re-let is the prima facie reasonable rental value, that does not mean the rents reserved under a newly signed post-breach lease should not be adjusted to account for expenditures that would ordinarily affect net rental income. (Indeed, in the case of a true post-breach re-let—that is, a lease whose first year would begin after Guess breached the Guess Lease—leasing commission and free rent expenditures *would* be made in year one.) In any event, even Haims's scenarios that look to the Madden rents in determining the reasonable rental value of the Premises assume that a new "market" lease will begin in year nine, and therefore deduct free rent and leasing commissions from year-nine rents. DX A at 61. So the Court's conclusion that these deductions should actually be made in year one has a relatively small effect on damages: the only difference is that the deductions are discounted by less.

they subtract a leasing commission of 48% of the first year's rental income and four months' worth of free rent. DX A at 76; PX 1 at 25. In his Madden/market scenarios—i.e., the scenarios in which the first eight years of the market lease reflect the income generated by the Madden Lease, and years nine through fifteen reflect a hypothetical market lease—Haims proposes a lower leasing commission on the assumption that "the landlord has its own brokerage firm and, therefore, was only responsible for paying half of the typical retail leasing commissions due to the tenant's broker." DX 1 at 71. His report does not explain why that assumption is appropriate in the Madden/market scenarios but not the market-only scenarios, in which, as noted, he does not assume that the landlord is responsible for only half of the leasing commission.

In any event, because a market-only approach (and not a Madden/market approach) is appropriate, the Court need not address this discrepancy further. In determining the reasonable rental value of the Premises, the Court will deduct a leasing commission of 48% of projected annual rental income in year one of the hypothetical market lease, as well as four months' worth of free rent, or one third of the projected annual rental income. The Court must now determine the projected rental income for the market lease over the fifteen-year term described in Section 19.3 of the Guess Lease.

**D. Projected Rental Income**

For the following reasons, based on the evidence in the record, the Court concludes that the rental income generated by the Premises can be projected most accurately by using the existing Madden Lease as the only comparable lease and adjusting the rents thereunder downward to account for market conditions. The Court is not persuaded that any of the parties' proposed alternatives is superior to this approach. In particular, 720 Lex's comparables analysis is flawed both because it ignores features of the Premises that distinguish it from other properties

and because its adjustment based on changes in market conditions is not credible. For its part, Guess's comparables analysis is flawed because it effectively results in an unrealistic *upward* adjustment for market conditions. As explained below, the Court's alternative conclusion is the best one supported by evidence in the record to achieve the parties' contracted-to agreement to base liquidated damages on the fair and reasonable rental value of the Premises.

### 1. The Madden Lease Is the Best Comparable

Although the Court disagrees with Guess's argument that the Madden Lease provides the prima facie reasonable rental value of the Premises under section 19.3 of the Guess Lease, the evidence presented persuasively demonstrates that the Madden Lease (with appropriate adjustments) is nevertheless the best comparable for determining the reasonable rental value of the Premises. Most significantly, the Court is persuaded by Guess's intuitive argument that the Madden Lease is "the most salient comparable because it is the exact same building, with an actual signed lease and an active tenant who is currently paying rent." Guess Post-Trial FFCL at 19 (emphasis omitted). In other words, it stands to reason that in assessing the market value of a given property, one ought to begin by asking how much the current tenant is actually paying for that same property. The Court found Haims's trial testimony on this point both credible and persuasive. *E.g.*, Tr. at 233:16–234:2.

Other evidence supports this approach by demonstrating that the Premises has several uniquely valuable features that distinguish it from other comparable properties. In essence, the remodel completed by Madden converted the third and fourth floors of the Premises into a giant sign, the prominence and value of which were amplified by the Premises' corner location near Bloomingdale's. Tr. at 45:7–12, 48:20–21 (Novich); PX S–V. In connection with the second amendment to the Madden Lease, under which Madden leased the third and fourth floors of the

Premises, Madden specifically negotiated and paid for the "sole right to place exterior signage on the Building and the right to license such right to a third-party." DX E § 12. According to Novich, the signage rights were "a big part of the reason" that Madden paid as much as it did to lease the third and fourth floors under the second lease amendment. Tr. at 49:11–15. As a result, while the third and fourth floors of a typical retail property might be used only for storage or for office space, the third and fourth floors of the Premises were uniquely valuable to Madden because of the marketing opportunity presented by the signage rights. And the rent that Madden paid for those floors reflected this unique value.

Indeed, not only Madden but also Guess recognized and was willing to pay for the unique marketing opportunity that the Premises' third and fourth floors represented. In marketing the property to Guess, 720 Lex and Crown Acquisition LLC, an affiliate of 720 Lex, created mock-ups of the building that displayed enormous Guess signs clearly visible on the exterior of the third and fourth floors of the Premises. PX R at 2–3; *see also, e.g.*, Tr. at 351:15–16 (Siegel) (indicating that the pictures of the Premises in Plaintiff's Exhibit R "came to us from the landlord"); Siegel Aff., DX EE, ¶ 13. Siegel testified that Guess was attracted to the Premises in part because of "the amazing presence of a sign that basically covered the side of the front of a building in such a small corner area." Tr. at 353:11–13. And like Madden, Guess obtained signage rights in negotiating the Guess Lease. *See* PX 4 § 25.A ("Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to have the maximum exterior signage permitted by local governance, codes or ordinances."). Siegel stated that although Guess did not ascribe a specific value to the signage in negotiating the lease, the signage rights were a "significant enhancement that factored into the overall rent that was appropriate for the subject property." Siegel Aff., DX EE, ¶ 14. As noted earlier, the Court credits this testimony. In other

words, for Guess as for Madden, the marketing opportunity presented by the third and fourth floors was a significant factor in determining how much to pay for the Premises.

Based on this evidence, the Court agrees with Guess that in arriving at a reasonable rental value for the Premises, the value of the marketing opportunity created by the third and fourth floors should be accounted for in projecting how much a hypothetical tenant signing a new lease in August 2009 would have paid to lease the Premises. Both of the actual tenants who signed leases for the same exact space paid the rent they did at least partly because of that marketing opportunity. Determining the reasonable rental value of the Premises requires the assumption that that hypothetical tenant would do the same.

The Court rejects 720 Lex's primary argument to the contrary, which is based on its contention that the signage displayed by Madden was illegal under New York City zoning laws. 720 Lex argues that a hypothetical new tenant leasing the Premises in August 2009 would not be expected to pay for the right to display signage that it was legally prohibited from displaying. But the Court need not confront the intricacies of New York City zoning law, because 720 Lex's laserlike focus on the signage's legality is too narrow. The relevant question is how much a hypothetical tenant would pay for the Premises in the real world, not whether the assumptions guiding that tenant's decision on how much to pay are consistent with New York City zoning regulations in the abstract. As noted above, the evidence decisively establishes that both of the actual tenants who agreed to lease the Premises—Madden and Guess—paid what they did in part because of the signage rights provided for in their leases. In agreeing to lease the Premises, these two tenants might have concluded that a large painted sign on the third and fourth floors was legal, they might have simply assumed that it was, or they might have taken a calculated risk that

New York City authorities would not require the sign to be removed even if it was illegal.[8]  In

any event, 720 Lex points to no evidence suggesting that the legal rules under which Madden

decided how much to pay for the Premises had changed by August 2009; in fact, it claims that

the sign that Madden painted on the building following its remodel was illegal on the day it went

up.  *See* 720 Lex *Daubert* Opp. at 13 ("[T]he Madden signage, when originally painted, did not

comply with the then-applicable zoning.").  As a result, the bundle of rights that a hypothetical

new tenant would have received in August 2009—the rights granted by a new lease, constrained

by applicable zoning law—would have been the same as the bundle of rights that Madden

received under the Madden Lease and its amendments.  And because 720 Lex has not persuaded

the Court that the hypothetical new tenant would make materially different signage-related

valuation assumptions than Madden did, whether the Madden sign is illegal does not affect the

conclusion that the Madden Lease ranks as the most salient comparable for the purpose of

calculating reasonable rental value.

   The conclusion that the third and fourth floors of the Premises should be valued so as to

account for the signage rights means that 720 Lex's comparables analysis must be rejected.

Unlike Haims, Von Ancken and Picoli used a floor-by-floor method for projecting the Premises'

reasonable rental value: they calculated a per-square-foot value for each floor, multiplied those

numbers by the amount of square footage on each floor (including the basement), and then added

the resulting numbers to arrive at a total value for all five floors combined.  PX 1 at 25.  The

value that 720 Lex's experts assigned to the third and fourth floors was $50 per square foot,

---

[8] Indeed, there is no evidence that anyone other than 720 Lex's lawyers and experts in this lawsuit has ever
questioned the Madden sign's legality.  Neither New York City nor 720 Lex, as Madden's landlord, has ever told
Madden to take down the sign.  Tr. at 31:6–14 (Novich).  There is no evidence that the city, which approved the
permit application for Madden's remodel, expressed concern over the sign.  DX W–X; Tr. at 36:3–6 (Novich).  And
marketing materials sent to Guess included photographs and mock-ups in which large signs were displayed on the
side of the building.  DX R, V.

because despite the fact that Madden is paying almost $150 per square foot for those two floors,

they could not "be considered as anything better than Class C office space." *Id.* at 24; *see also*

DX A at 66; Tr. at 164:3–7 (Von Ancken). This analysis is inconsistent with the Court's finding

that a hypothetical tenant deciding how much to pay for the Premises in August 2009 would have

based its analysis largely on the same factors as Madden did—including the signage rights

associated with the third and fourth floors. Those floors are worth more than Class C office

space, as evidenced by the fact that Madden was actually paying almost three times more than

720 Lex's valuation of those floors. Additionally, 720 Lex's faulty valuation of the third and

fourth floors led it to arrive at a reasonable rental value of $140 per square foot for the entire

Premises—roughly 36% lower than the net income generated by the Madden Lease on the exact

same property only two years earlier.[9]  The Court cannot adopt a result so inconsistent with the

best real-world evidence about the rental value of the Premises. Certainly, 720 Lex has failed as

both an evidentiary and legal matter to persuade the Court that it should.

       The Court's conclusion that 720 Lex's experts' methodology was flawed was reinforced

by Von Ancken's testimony at trial, which the Court found to be not credible in several respects.

With respect to the salience of the Madden Lease, Von Ancken's deposition testimony, portions

of which were read by defense counsel at trial, appeared to indicate that the Madden Lease was

the most important indicator of market value. Tr. at 90:16–93:8. In attempting to explain that

deposition testimony, Von Ancken asserted that an appraiser would have to look to the Madden

rents only under an interpretation of section 19.3 that viewed those rents as a post-breach re-let.

*E.g.*, Tr. at 94:16–20. But his quoted deposition testimony seemed to indicate that even under an

interpretation of section 19.3 that required examining "market information to determine what the

---

[9] On a net basis (i.e., after deducting real-estate taxes paid by the landlord), the Madden Lease generates $1,192,071 in income in year one, or roughly $218 per square foot. PX A at 73.

actual difference was," an appraiser still should rely on the Madden Lease "since [it] was a recent lease made in 2007," and therefore was, "with adjustments, a fairly good indication as to what the rent would be for that space." Tr. at 92:19–23. The fact that this reliance on the terms of an actual lease for the same space—a reliance that, as explained above, the Court endorses— was not ultimately reflected in Von Ancken and Picoli's report undermines that report's validity.

Von Ancken's explanation for why he disregarded the rents reserved under the Madden Lease amendments in projecting the market value of the property was also inconsistent and self-contradictory. On cross-examination, he appeared to back away from deposition testimony that Madden had paid "extraordinary value" for its signage, instead speculating (without a clear foundation) that Madden was pressured into paying above-market rent for the third and fourth floors because it needed storage room for shoes. *E.g.*, Tr. at 162:11–163:3, 174:3–176:19. But Von Ancken also testified that he ignored the difference between the amount Madden was paying and the $50 per foot that he assigned to the third and fourth floors because he thought that Madden's signage was illegal. Tr. at 177:2–12. If that were true, then he would have had no reason to insist that Madden paid above-market rent for storage, and not for signage, because a signage premium would have been inappropriate in any event. In short, Von Ancken's testimony—as well as his demeanor while being examined on these issues—suggested to the Court that he was searching for reasons to justify his $50-per-foot valuation for the third and fourth floors, rather than fitting his analysis to the facts.

Later, Von Ancken also insisted that Madden was not a salient comparable, instead ranking the Sprinkles Cupcake store as one of the two most important. Tr. at 186:22–25. Even with minor upward adjustments, the Sprinkles lease generates by far the lowest rent per square foot of the seven leases that Von Ancken and Picoli examined, PX 1 at 22, and the Sprinkles

store does not resemble the Premises in any respect, *see id.* at 35 (displaying photograph of Sprinkles Cupcakes store). Von Ancken's reliance on the Sprinkles lease again suggested that he was more interested in generating a low valuation of the Premises than in accuracy. For all of these reasons, the Court rejects 720 Lex's comparables analysis.

### 2.  The Madden Rents Will Be Adjusted Downward By 0.9%

Although the Court finds that the Madden Lease is the best comparable and that 720 Lex's comparables analysis is seriously flawed, the Court nonetheless agrees in principle with 720 Lex that—given that an analysis of market rents is required—looking only to the Madden rents generates a higher-than-market rental value for the Premises. That is, if 720 Lex had leased the property to a new tenant based on a new lease signed in August 2009, after Guess breached the Guess Lease, that tenant would have paid less than Madden was and is obligated to pay under the Madden Lease. This is because the Madden Lease and its amendments were signed before a historic market downturn in 2008 and 2009.

The Madden Lease and its first amendment were signed in early 2007. Even under Haims's analysis, rental values leveled off around August 2007 and then decreased significantly between September 2008 and August 2009, after the crisis involving Lehman Brothers and other large financial institutions. DX A at 63. As a result, Haims adjusted the Madden rents downward by 0.9% based on the change in market conditions between when the Madden Lease was signed and August 2009. *Id.* at 61. In other words, if the Madden Lease had been signed in August 2009 instead of in 2007, the initial rent thereunder would have been 0.9% lower. Von Ancken and Picoli also made a market conditions adjustment to the Madden rents in their comparables analysis: they arrived at a downward adjustment of 25%. PX 1 at 22. So although the parties dispute the amount by which the Madden rents should be adjusted downward, all of

32

the evidence presented suggests that some downward adjustment would be appropriate—even if the Madden Lease were the only comparable used to determine the rental value of the Premises in August 2009, at the time of Guess's breach.

One consequence of this conclusion is that Haims's comparables analysis, which forms the basis of his projections for the "market" rental value of the Premises as of August 2009, must be rejected because it arrives at an August 2009 rental value for the Premises that is significantly *higher* than the rental value of the 2007 Madden Lease. Adjusting for free rent and leasing commissions in the case of the hypothetical "market" lease, the amount of income in year one under the Madden Lease is $1,192,071 in Haims's analysis, while the equivalent amount under the market lease is $1,309,680.[10]  DX A at 73, 79. A similar relationship exists in subsequent years. This result is logically inconsistent with the Court's findings that the Madden Lease should be the preeminent comparable in assessing the reasonable rental value of the Premises and that the reasonable rental value of the Premises was lower in August 2009 than it was in early 2007. For this reason alone, even setting aside 720 Lex's specific objections that the comparable properties relied on by Haims were too different from the subject property, *e.g.*, Von Ancken Aff., PX 9, ¶¶ 19–20, the Court must reject Haims's comparables analysis and the "market" rents it generates.

However, the Court also concludes that the 25% market-conditions adjustment that 720 Lex's experts imposed on the Madden Lease, PX 1 at 22, is too large to be credible. Von Ancken and Picoli arrived at that adjustment by assuming that market rents were "relatively flat" from January 2007 to August 2008 and then declined at a rate of 2.5% per month from

---

[10] This comparison is "apples to apples" because it measures the net rental income that would be received by 720 Lex. As noted above, under the Madden Lease, 720 Lex pays real estate taxes, so the total rent paid by the tenant must be adjusted by the amount of the tax payment to arrive at a "fully net" number. DX A at 70.

September 2008 through June 2009. *Id.* at 23. Notably, 720 Lex does not present any specific evidence explaining how it arrived at those numbers, which are inconsistent with the REBNY survey cited by Guess: they do not account for apparent increases in rents in early 2007, and they drop more precipitously on a month-by-month basis after the collapse of Lehman Brothers in September 2008. DX A at 63. Although 720 Lex casts doubt on the reliability of the REBNY survey, *see* PX 3 at 5, it cannot successfully argue that its wholly unsupported numbers are more reliable than Guess's debatable (but supported) numbers. In addition, the Court was generally persuaded by Haims's testimony that the broad market declines starting in 2008 did not affect properties in the desirable Lexington Avenue retail corridor as severely as they affected other properties throughout the country. Tr. at 258:8–261:11. This testimony was consistent with the fact that one of the comparable leases used by both parties—the lease for the Shoe Woo store at 750 Lexington Avenue, which was signed in February 2009—generated more per-square-foot rent than the Madden Lease, both for at-grade space alone and for the property as a whole. PX 1 at 22; DX A at 61; Tr. at 260:20–23 (Haims). Although the buildings are different, even Von Ancken conceded that the Shoe Woo lease was an important comparable, Tr. at 186:5–7, and the fact that Shoe Woo paid so much in February 2009 undermines Von Ancken's assumption that the "catacl[y]smic changes" to the broader marketplace had a severe effect on the Premises, given their desirable location on Lexington Avenue. Tr. at 181:17. For all of these reasons, the Court rejects 720 Lex's suggestion that the Madden rents must be adjusted downward by 25% to reflect the decline in market conditions.

The only other alternative supported by the record is to use Haims's downward adjustment of 0.9%. To be sure, 720 Lex casts some doubt on Haims's methodology. Not only does 720 Lex explain that the REBNY survey numbers that Haims cited represent "asking" rents

34

that are too slow to adjust to a declining market, PX 3 at 5, but it also points to a report prepared
by Haims in connection with an unrelated action in which he made downward market-conditions
adjustments of 30% or more for similar properties and time periods, Tr. at 268:10–272:14; PX
11. But even accepting 720 Lex's premise that Haims tailored these two analyses to suit his
clients rather than to reflect the truth—and even if the Court were to hold that consideration of
Haims's earlier report is appropriate despite 720 Lex's springing it on Guess at trial[11]—that
would not affect the Court's conclusion. For one thing, in light of Haims's generally credible
testimony, the REBNY survey data, and a comparable lease suggesting that the Lexington
Avenue corridor was not severely affected by the financial crisis, it is possible that Haims's
earlier report—and not the one that he prepared for this case—was erroneous. In any event, the
Court is effectively forced to choose between a 25% adjustment and a 0.9% adjustment, because
there is no evidence in the record supporting anything else. For the reasons discussed above, the
Court finds that the 0.9% number is better supported by the evidence in the record. Accordingly,
in determining the reasonable rental value of the Premises in August 2009, the Court will reduce
the net rent under the Madden Lease by 0.9%.

### 3.  Year-over-Year Increases

Although this subject was not the focus of significant testimony at trial, the parties'
experts both used the same general approach to projecting the annual rental income generated by
the Premises in years two through fifteen of the hypothetical market lease: they took what they
believed to be an appropriate year-one rental value and applied year-over-year growth rates to
that value. However, the competing experts chose different year-over-year growth rates.

---

[11] At trial, the Court reserved decision on whether 720 Lex's failure to reveal Exhibit 11 earlier, contrary to the
Court's warning that counsel should exchange all documents with their adversary before introducing them, was
grounds for holding that the report was inadmissible. Tr. at 267:20–22, 383:13–16.

Specifically, 720 Lex's experts assumed an annual growth rate of 2.5% for the entire term of the lease, "[c]onsistent with the market," PX 1 at 25, while Haims took a slightly more nuanced approach under which rent was stable from year one to year two, grew by 2% from year two to year three, and then grew at an annual rate of 3% thereafter for the remaining lease term, DX A at 71. These numbers compare to a constant 3% annual growth rate, starting in year two, under the actual terms of the Guess Lease. PX 1 at 19.

The Court will adopt Haims's scenario not only because it is, for the bulk of the lease term, consistent with an actual signed lease on the Premises (i.e., the Guess Lease) but also because 720 Lex's experts themselves recognize that market rents in general were projected to grow at a 3% annual rate after 2012. PX 1 at 30. This projection appears to contradict their assumption that the rent for the Premises would increase at a lower rate in those same years. As a result, the Court will assume that the initial annual rental income of $1,192,071 remains flat from year one to year two, increases by 2% from year two to year three, and increases at a 3% annual rate thereafter.[12]

### E. A Five Percent Discount Rate Is Appropriate

Because the Guess Lease does not specify the discount rate to be used in determining "the then fair and reasonable rental value of the Premises," PX 4 § 19.3, the Court must determine an appropriate discount rate. All else equal, a higher discount rate leads to a lower rental value of the Premises, and therefore higher damages. For the following reasons, the Court concludes that 5% is a proper discount rate and rejects the parties' alternatives.

---

[12] Notably, although one would expect a faster-growing rental income stream to increase the value of clause (2) of section 19.3 relative to clause (1)—and therefore decrease damages—the Court's own calculations show that Haims's approach actually leads to higher damages, all else equal, due to the initial stability of the rental income.

The language of the Guess Lease itself strongly suggests that the correct discount rate is the one that the market would apply to the projected future rental income. Although both parties' experts arrived at the rental value of the Premises by projecting annual rental income, applying a discount factor to each year's income, and then adding those discounted cash flows together to obtain one number, section 19.3 does not actually require this project-then-discount methodology. To assume that rent projections should be based on market conditions but then apply a non-market discount rate to those projections would be odd in light of the fact that section 19.3 speaks only of a single, unitary "value" of the Premises. From this perspective, the Guess Lease is not, in fact, silent on the appropriate discount rate; it simply requires a discount rate that leads to the "fair and reasonable rental value of the Premises." Thus, it calls for a market discount rate. *See Varney*, 217 N.Y. at 228 (stating that "fair and reasonable value" is synonymous with "market value"); Von Ancken Aff., PX 9, ¶ 9 ("For a real estate appraiser, 'fair and reasonable value' has a definite, precise, and commonly understood meaning, *i.e.*, market value."). Contrary to Guess's suggestion, this conclusion involves interpreting terms already in the Guess Lease—not supplying new ones. *See, e.g.*, *Pinnacle Books, Inc. v. Harlequin Enters. Ltd.*, 519 F. Supp. 118, 121 (S.D.N.Y. 1981) ("It is hornbook law that courts cannot and will not supply the material terms of a contract.").

Additionally, Guess's proposed alternatives to a market discount rate have serious flaws. Guess's proposed alternatives are a 0% discount rate, in light of the Guess Lease's silence on the subject, or a 4% discount rate, based on the lease's prescribed discount rate for the scheduled Guess rents. Guess Post-Trial FFCL at 16–17. The proposition that 0% would be appropriate is untenable. It would be unreasonable to conclude that the parties intended for liquidated damages to be determined by comparing an undiscounted stream of cash flows against a discounted one,

37

thereby leading to an artificially low liquidated damages number. *Cf. Shatkin*, 727 F.2d at 208 (affirming exclusion of testimony of expert who compared discounted and undiscounted cash flows in part because such an "'apples and oranges' comparison . . . simply cannot withstand scrutiny"). And as explained above, Guess's suggestion that the lease is "silent" is not strictly accurate.

Guess's argument that the Guess Lease calls for a 4% discount rate fares no better. The lease specifies that a 4% discount rate should be applied to "clause (1) above"—i.e., the rent reserved under the Guess Lease. PX 4 § 19.3. Under basic principles of contract interpretation, this implies that something other than 4% should be applied to clause (2)—i.e., the fair and reasonable rental value of the Premises. *See, e.g.*, *Credit Suisse Sec. (USA) LLC v. Grand Circle LLC*, No. 11-cv-232 (JGK), 2013 WL 5312511, at *12 n.5 (S.D.N.Y. Sept. 23, 2013). Had the parties intended for a 4% rate to apply to clause (2) as well, they would have said so. Nor has Guess pointed to any extrinsic evidence suggesting that the parties intended for a 4% discount rate to apply to both clause (2) and clause (1).

Therefore, the Court must determine an appropriate market discount rate. Both parties' expert reports include scenarios that utilize a market discount rate: Haims adopts a 5% discount rate, and Von Ancken and Picoli adopt a 7.5% discount rate. DX A at 77–78; PX 1 at 26–27. As explained below, Haims's analysis on this subject was more persuasive, so the Court adopts the market discount rate of 5% used in his analysis.

Von Ancken and Picoli arrived at a discount rate of 7.5% primarily by looking to two surveys of discount rates for other commercial real estate properties in the second quarter of 2009. The Korpacz survey reported discount rates of 7.5% to 12% for national strip shopping centers and 8% to 12% for national net lease properties. PX 1 at 27. The RERC survey reported

38

an average discount rate of 9.2% for "Neighborhood/Community Retail" properties in the New York area, and a range of 8% to 12% for national strip shopping centers. *Id.* As Von Ancken conceded on cross-examination, these surveys included properties markedly different from the Premises, in terms of location and risk. Tr. at 138:19–141:21.

To be sure, a 7.5% discount rate falls at the lower end of the ranges reported by the two surveys and is lower than the 9.2% average for properties in the New York metropolitan area, and Von Ancken and Picoli's report indicates that the characteristics of the subject property called for a rate "well below the city-wide average." PX 1 at 27. But the Court did not find Von Ancken's testimony on this issue to be credible, undermining his assertion that his adjustments were large enough to capture the unique nature of the subject property. For instance, Von Ancken's testimony that national properties were "[n]ot necessarily" higher-risk than Manhattan properties was inconsistent both with language in his expert report, Tr. at 141:5–21, and with testimony emphasizing that the subject property was in nearly the strongest area nation-wide for retail properties. He also equivocated with respect to whether the subject property was actually within the "best" segment of the Lexington Avenue retail corridor. Tr. at 143:15–24. Finally, the Court found his testimony that Madden's substantial remodeling was irrelevant to the appropriate discount rate to be not credible. Tr. at 145:5.

Haims arrived at a 5% discount rate after concluding that the risk associated with the rental income was comparable to the yield on AAA-rated corporate bonds. DX A at 78. The Court found Haims's testimony more credible than Von Ancken's on this point, both in terms of the two witnesses' demeanors and because Haims convincingly explained how his analysis rested on the specific subject property, the area in which it was located, and the way in which investors would look at these factors. Tr. at 290:21–291:6.

In the Court's view, 720 Lex's chief argument against Haims's methodology is a red herring. In attempting to cast doubt on the choice of AAA corporate bonds as an appropriate benchmark, 720 Lex points to the fact that Guess, Madden, and other comparable tenants do not themselves have AAA corporate ratings. 720 Lex Post-Trial FFCL at 23; Tr. at 291:17–292:8. But 720 Lex does not explain why a tenant's corporate bond rating, which reflects the likelihood that the tenant will pay off its unsecured corporate debts, has anything more than a tangential relationship to the chances that the tenant will default on a specific real estate lease or that another tenant will fill the empty space in the event of a default. Therefore, Haims's forthright testimony that he was "not looking at anyone's rating" in assessing the risk associated with the subject property's rental income is hardly fatal. Tr. at 291:18. There may well be other reasons to question his methodology, but 720 Lex has not put any such reasons into the record. Accordingly, the Court adopts Haims's market discount rate of 5%.

### F. The Set-Offs Will Be Deducted

Guess argues that two amounts of money that 720 Lex saved as a result of Guess's breach should be deducted from liquidated damages. Guess Post-Trial FFCL at 19–20. Specifically, 720 Lex was not required to pay a leasing commission to its broker, Urban, because the commission agreement with Urban provided that the commission would be payable one-third upon "possession," one-third upon "rent commencement," and one-third forty days "after commencement." DX M at 1; PX 7 at 1. Because Guess never possessed the Premises, no obligation to pay these commissions ever arose. Additionally, 720 Lex did not pay a termination fee to Madden, which it would have paid had it terminated the lease in order to deliver possession of the Premises to Guess. DX H § 4(c).

When a contract contains a valid and enforceable liquidated damages clause, "the measure of damages for a breach will be the sum in the clause, no more, no less." *JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d 373, 380 (2005) (quoting *Brecher v. Laikin*, 430 F. Supp. 103, 106 (S.D.N.Y. 1977)). The Court must therefore determine whether the set-offs that Guess describes should be deducted as part of the calculation prescribed by Section 19.3. Pointing to the phrase "reasonable rental value" in clause (2), Guess argues that the value of the Premises includes the documented cost savings attributable to Guess's breach. The Court agrees, for two reasons.

First, although the parties have presented little extrinsic evidence to assist in the interpretation of the vague phrase "reasonable rental value," testimony by 720 Lex's own expert suggests that he would have incorporated the two set-offs into his valuation of the Premises had he been starting from square one. Tr. at 108:15–111:9 (Von Ancken). Second, New York courts' skepticism about liquidated damages clauses that do not "bear[] a reasonable proportion to the probable loss," *Truck Rent-A-Center, Inc. v. Puritan Farms 2d, Inc.*, 41 N.Y.2d 420, 425 (1977), is another reason to prefer an interpretation that more closely approximates the actual position in which 720 Lex found itself post-breach. The interaction between section 19.3 and the facts of this case arguably leads to a windfall for 720 Lex, and, as explained in more detail below, Guess must nonetheless be held to the contract that it signed. But vague language need not be interpreted to maximize that windfall in the absence of other evidence of the parties' intentions.

The Court is not persuaded otherwise by 720 Lex's argument that section 19.3 does not specifically mention the savings cited by Guess; those savings can be incorporated into the phrase "reasonable rental value," as described above. 720 Lex also points to section 19.4 of the

41

Guess Lease, which states that "[n]othing herein contained shall be construed as limiting or precluding the recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default hereunder on the part of Tenant." PX 4 § 19.4. Citing this provision, 720 Lex claims that if it had actually paid leasing commissions or termination fees before Guess's breach, it would have been able to recover those amounts from Guess in addition to the liquidated damages prescribed by section 19.3. Tr. at 390:17–392:9. But 720 Lex also would have paid the commission and termination fee had Guess taken possession of the Premises and *not* thereafter breached the lease, so it is difficult to see how those payments would have been incurred "by reason of" Guess's breach. Nor does 720 Lex point to any evidence supporting its reading of section 19.4. The Court therefore concludes that the two amounts should be deducted.

Nonetheless, the Court agrees with 720 Lex that the amount of the deducted broker's commission should be $400,000, not $675,000. The initial agreement with Urban was dated April 4, 2008, DX M, but that agreement was later modified on July 1, 2009, PX 7. In assessing the reasonable rental value of the Premises, both parties use a valuation date of August 1, 2009, and indeed Guess argues that "[t]he proper number is $675,000, the amount negotiated prior to August 1, 2009." Guess Post-Trial Resp. at 8 n.6. Given that, contrary to Guess's representation, the modified agreement providing for a $400,000 commission was signed on July 1, 2009—that is, "prior to August 1, 2009"—the Court concludes that the modified agreement was the one in effect at the relevant time. As a result, the Court will deduct a total of $900,000 ($500,000 for the unpaid termination fee and $400,000 for the unpaid leasing commission) from the discounted market rent calculation described above.

42

### G. Summary of Damages Calculation

As noted earlier in this opinion, it is undisputed that the discounted value of clause (1) of section 19.3 of the Guess Lease—all rent reserved under the Guess Lease over its entire 15-year term, discounted at a 4% rate—is $18,968,816.  The following summary, consistent with the analysis set forth above, describes all of the steps that the Court has taken in calculating the discounted value of clause (2) of section 19.3—the "then fair and reasonable rental value of the Premises"—for the same 15-year term.  A spreadsheet depicting these calculations is reproduced as Appendix A to this opinion.

- The Madden Lease is the only comparable to be used.  The Madden Lease provides for total net rental income (after the payment of real-estate taxes) of $1,192,071 in year one of the hypothetical market lease.  DX A at 73; PX 2 at 10.

- The year-one rents for the Madden Lease are to be adjusted downward by 0.9% to account for market conditions.  As a result of this adjustment, the total year-one net rental income of the Premises is $1,181,342.

- A leasing commission amounting to 48% of the first year's rent and four months' worth of free rent (calculated based on the first year's rent) are to be deducted from the year-one net rental income.  These amounts are $567,044 and $393,780, respectively.  After accounting for these deductions, year-one net rental income is $220,517.

- The top-line net rental income (i.e., before deducting the leasing commission and free rent described above) remains flat from year one to year two, increases by 2% from year two to year three, and increases at a 3% annual rate thereafter through year 15.

- The resulting net rental income amounts are to be discounted at a 5% rate.

- A forgone termination fee of $500,000 and a foregone leasing commission of $400,000 are to be added to the sum of the annual discounted net rental income amounts to determine the Premises' overall "fair and reasonable rental value."

These calculations yield a present value for clause (2) of $14,269,759.  Subtracting that value from the discounted value of clause (1) yields a total liquidated damages amount of $4,699,057.

43

### H. The Resulting Award Is Not an Impermissible Windfall

On the final day of trial, Guess argued for the first time that awarding liquidated damages to 720 Lex pursuant to section 19.3 of the Guess Lease would result in an impermissible windfall; it repeats this argument in its post-trial submissions. Guess Post-Trial FFCL at 22–23. It cites case law purportedly establishing that a liquidated damages provision calling for "an amount that is plainly and grossly disproportionate to the probable loss is an unenforceable penalty." *Id.* (citing, inter alia, *Truck Rent-A-Center*, 41 N.Y.2d at 425–26). This argument's limiting principle is hard to pin down: Guess appears to argue that only 720 Lex's damages assessment is grossly disproportional, because it seems willing to accept that its own expert's assessment is not. *Id.* at 23. As a result, it is unclear whether the Court's assessment—which is lower than 720 Lex's but higher than Guess's—would be invalid under Guess's theory. In any event, the Court rejects Guess's theory.

It is true that under New York law, a contractual provision prescribing liquidated damages that are "grossly disproportionate to the amount of actual damages provides for penalty and is unenforceable." *Truck Rent-A-Center*, 41 N.Y.2d at 424. But Guess overlooks the fact that in determining whether a liquidated damages provision is an unenforceable penalty, the provision must be "interpreted as of its date, not as of its breach." *Seidlitz v. Auerbach*, 230 N.Y. 167, 172 (1920); *accord, e.g.*, *JMD Holding Corp.*, 4 N.Y.3d at 385 (asking whether relationship between probable loss and early termination fee was grossly disproportionate "at the time the parties executed the Agreement"); *Truck Rent-A-Center*, 41 N.Y.2d at 425 (assessing whether a liquidated damages provision was a penalty "[l]ooking forward from the date of the lease"). As a result, section 19.3's enforceability depends on whether, in June 2008, that provision would

44

have been expected to yield liquidated damages grossly disproportionate to 720 Lex's actual loss in the event of a breach.

From this standpoint, section 19.3 is plainly enforceable. It calls for subtracting clause (2) from clause (1). Clause (1) is a constant, so the magnitude of liquidated damages bears an inverse relationship to the magnitude of clause (2): as the reasonable rental value of the Premises goes up, liquidated damages go down. Notably, this reflects the fact that 720 Lex's *actual* damages would go up were it forced to rent empty space in a down market, and that its actual damages would go down if market rents at the time of breach were higher relative to the Guess rents. Any mismatch between liquidated damages and actual damages in this case stems from the fact that market conditions improved between the time of breach and the trial date. That is because section 19.3 looks to the "*then* fair and reasonable rental value of the Premises," and the rental value of the property in 2009—in the midst of a historic downturn—was, at least in Guess's view, lower than the value that 720 Lex has actually extracted from the property as the economy has improved. Guess Post-Trial FFCL at 23.

So in hindsight, the fact that the market value of the Premises is determined as of breach has arguably worked in 720 Lex's favor. But that was hardly inevitable: if market conditions had deteriorated between the time of breach and the time of trial, then looking to the Premises' rental value in 2009 would likely understate 720 Lex's true losses. When they signed the Guess Lease, the parties could not have known whether the market would improve between breach and trial, and therefore who would benefit from that time lag. The Court therefore cannot conclude that in June 2008, the damages prescribed by section 19.3 were "grossly disproportionate" to 720 Lex's anticipated actual damages.

45

Because Guess's penalty/windfall argument against enforcing the liquidated damages provision fails, the Court need not decide whether 720 Lex is correct that Guess waived this argument by not pleading it or raising it before trial. *Compare, e.g.*, *Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp.*, No. 94-cv-4725 (CSH), 1999 WL 11553, at *13 (S.D.N.Y. Jan. 13, 1999) ("[W]hile waiver is often the consequence for failure to plead most affirmative defenses, an affirmative defense alleging that a contract is illegal and should not be enforced on public policy grounds presents an exception to that general rule . . . ."), *with Wechsler v. Hunt Health Sys., Ltd.*, 216 F. Supp. 2d 347, 353 (S.D.N.Y. 2002) (holding that defendant waived unenforceability defense where plaintiff would be prejudiced). Section 19.3 is enforceable, and the Court will determine damages accordingly.

### I.  Issues Yet to Be Decided

In closing, the Court notes that two issues bearing on 720 Lex's ultimate recovery have yet to be addressed. First, along with their pretrial submissions, both parties submitted evidence concerning experts' and attorneys' fees. However, at the final pretrial conference on September 26, 2013, the Court and the parties agreed to reserve the question of fees until after liquidated damages were determined. Accordingly, the Court reaches no conclusion with respect to fees at this time.

Second, in its post-trial reply memorandum, Guess raised the argument that 720 Lex is not entitled to prejudgment interest on its damages award because it has not yet suffered an actual loss, notwithstanding the fact that it is owed liquidated damages pursuant to section 19.3 of the Guess Lease. Guess Post-Trial Resp. at 8–9; *see, e.g.*, *Chaman LAL Setia Exports Ltd. v. Sawhney*, No. 00-cv-2838 (MBM), 2003 WL 21649652, at *4 (S.D.N.Y. May 28, 2003) ("When 'damages were incurred at various times,' interest shall be 'computed upon each item from the

date it was incurred or upon all of the damages from a single reasonable intermediate date.'"

(quoting N.Y. C.P.L.R. § 5001(b))).  In a letter submitted November 8, 2013, 720 Lex objected

to this argument as outside the scope of the arguments raised in 720 Lex's proposed findings of

fact and conclusions of law.  Dkt. No. 131.  In any event, because 720 Lex has not briefed the

issue of pre-judgment interest in any detail, resolving that issue would be premature at this time.

The Court will address both fees and prejudgment interest by subsequent order, after the parties

have had an opportunity to brief those issues.

## III.   Conclusion

For the foregoing reasons, 720 Lex is entitled to damages of $4,699,057.

The parties are directed to meet and confer no later than September 5, 2014 and attempt

to resolve the two yet-to-be-decided issues—fees and prejudgment interest—in good faith.  The

Court hereby sets the following schedule in the event that the parties are unable to reach a

resolution: 720 Lex's opening brief on experts' and attorneys' fees, of no more than ten pages, is

due September 12, 2014; Guess's opposition, of no more than ten pages, is due September 19;

and 720 Lex's reply, of no more than five pages, is due September 26.  Similarly, Guess's

opening brief on prejudgment interest, of no more than ten pages, is due September 12, 2014;

720 Lex's opposition, of no more than ten pages, is due September 19; and Guess's reply, of no

more than five pages, is due September 26.  The Court will direct the Clerk to enter judgment

after these issues are resolved.

SO ORDERED.

Dated: August _____, 2014
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

**APPENDIX A**

**ASSUMPTIONS:**

| | |
|---|---|
| Discount rate for clause (1) | 4.0% |
| Discount rate for clause (2) | 5.0% |
| Year One Net Rent (Madden Lease) | $ 1,192,071 |
| Market Conditions Adjustment | -0.90% |
| Year One Net Rent (Adjusted) | $ 1,181,342 |
| Leasing Commission (% of Year 1 Net Rent) | 48.0% |
| Free Rent (% of Year 1 Net Rent) | 33.3% |

**VALUATION ANALYSIS:**

| YEAR | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Clause (1): Rent reserved under the Guess Lease** | | | | | | | | | | | | | | | | |
| Rental Income | $ 750,000 | $ 1,500,000 | $ 1,545,000 | $ 1,591,350 | $ 1,639,091 | $ 1,688,263 | $ 1,738,911 | $ 1,791,078 | $ 1,844,811 | $ 1,900,155 | $ 1,957,160 | $ 2,015,875 | $ 2,076,351 | $ 2,138,641 | $ 2,202,801 | |
| Discounted Rental Income | $ 721,154 | $ 1,386,834 | $ 1,373,499 | $ 1,360,293 | $ 1,347,213 | $ 1,334,259 | $ 1,321,429 | $ 1,308,723 | $ 1,296,140 | $ 1,283,677 | $ 1,271,334 | $ 1,259,110 | $ 1,247,003 | $ 1,235,012 | $ 1,223,137 | $ 18,968,816 |
| **Clause (2): Fair and reasonable rental value** | | | | | | | | | | | | | | | | |
| Rental Income | $ 1,181,342 | $ 1,181,342 | $ 1,204,969 | $ 1,241,118 | $ 1,278,352 | $ 1,316,702 | $ 1,356,203 | $ 1,396,890 | $ 1,438,796 | $ 1,481,960 | $ 1,526,419 | $ 1,572,212 | $ 1,619,378 | $ 1,667,959 | $ 1,717,998 | |
| Year-over-Year Growth | | 0.0% | 2.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | |
| Leasing Commission Deduction | $ 567,044 | | | | | | | | | | | | | | | |
| Free Rent Deduction | $ 393,781 | | | | | | | | | | | | | | | |
| Net Rental Income | $ 220,517 | $ 1,181,342 | $ 1,204,969 | $ 1,241,118 | $ 1,278,352 | $ 1,316,702 | $ 1,356,203 | $ 1,396,890 | $ 1,438,796 | $ 1,481,960 | $ 1,526,419 | $ 1,572,212 | $ 1,619,378 | $ 1,667,959 | $ 1,717,998 | |
| Discounted Net Rental Income | $ 210,016 | $ 1,071,512 | $ 1,040,898 | $ 1,021,071 | $ 1,001,622 | $ 982,544 | $ 963,828 | $ 945,470 | $ 927,461 | $ 909,795 | $ 892,466 | $ 875,466 | $ 858,791 | $ 842,433 | $ 826,386 | $ 13,369,759 |

| | |
|---|---|
| Sum of Clause (1) - Sum of Clause (2): | $ 5,599,057 |
| Foregone Termination Fee | $ 500,000 |
| Foregone Leasing Commission | $ 400,000 |
| **DAMAGES** | **$ 4,699,057** |